## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JUSTIN GOINS, | ) | Case No. 1:24-cv-00653 |
| | ) | Case No. 1:25-cv-1448 |
| Plaintiff, | ) | |
| | ) | Judge J. Philip Calabrese |
| v. | ) | |
| | ) | |
| CORPORAL WINKEL, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Justin Goins filed suit against Defendants Sheriff Harold Pretel and Corporal William Winkel of the Cuyahoga County Sheriff's Office, alleging that they violated his constitutional rights during his pretrial detention.  The Court appointed counsel, and after discovery Defendants move for summary judgment.  For the reasons that follow, the Court **GRANTS** Defendants' motion.

## STATEMENT OF THE FACTS

On August 8, 2023, Plaintiff Justin Goins was a pre-trial detainee at the Cuyahoga County jail.  (ECF No. 37, ¶ 9, PageID #174; ECF No. 38, ¶ 9, PageID #185.) That morning, Corrections Officer Ketenich Vazquez escorted Mr. Goins back to his cell as part of a routine transport.  (ECF No. 46-1, PageID #427–28.)  In accordance with the standard practice for transporting inmates, Mr. Goins wore handcuffs in front of his body.  (*Id.*, PageID #424; ECF No. 48-1, PageID #767.)  On this occasion, as Officer Vazquez and Mr. Goins entered the area containing Mr. Goins' cell, another

inmate came up from behind and struck Mr. Goins on his head. (ECF No. 46-1, PageID #424.)

Surprised, angered, and dizzy after this attack, Mr. Goins attempted to respond, but Officer Vazquez stepped between Mr. Goins and his attacker to prevent escalation. (*Id.*, PageID #428–32.) Then, the attacker retreated to the safety of his cell while traded insults with Mr. Goins. (*Id.*, PageID #429; ECF No. 48-1, PageID #774–76; ECF No. 47-1, PageID #702–03.)

Corrections Officer Robert Baker overheard the commotion from a neighboring area within the jail. (ECF No. 47-1, PageID #705–06.) When he appeared at the scene, he saw Officer Vazquez urging Mr. Goins into his cell while Mr. Goins argued with the other inmate and disregarded Officer Vazquez. (*Id.*, PageID #697–98.) Officer Baker was not aware of the attack that triggered Mr. Goins' agitation. (*Id.*) To assist Officer Vazquez, Officer Baker attempted to calm Mr. Goins and directed him to enter his cell. (*Id.*) However, Mr. Goins was so upset that he paced and then struck his head against the wall in anger. (ECF No. 46-1, PageID #431–32; Surveillance Video at 16:58–17:11.) Because of his persistent noncompliance, Officer Baker sent a radio distress call for assistance. (ECF No. 47-1, PageID #714.)

### A.    Corporal Winkel

Corporal William Winkel responded to the distress call. (ECF No. 37, ¶ 12, PageID #174.) While corrections officers carried radios and handcuffs, supervisory officers such as Corporal Winkel also wore body cameras and carried pepper foam and a second set of handcuffs. (ECF No. 45, PageID #219–20.)

2

Upon his arrival, Corporal Winkel observed Mr. Goins yelling while officers tried to talk to him.  (ECF No. 45-1, PageID #249–51.)  Like Officer Baker, Corporal Winkel was not aware of the attack that preceded Mr. Goins' recalcitrant behavior.  (*Id*.)  From Mr. Goins' angry shouting and noncompliance, Corporal Winkel inferred that Mr. Goins had a dispute with the two corrections officers.  (*Id.*, PageID #252.)

His body camera captured much of Corporal Winkel's interaction with Mr. Goins.  Corporal Winkel approached Mr. Goins and commanded him to go to his cell.  (Winkel Bodycam at 0:00–0:20.)  Each time Corporal Winkel stated, "Go to your cell," Mr. Goins responded with, "Don't touch me" or "I ain't doing shit, n****."  (*Id*. at 0:14–0:22.)  After repeating his command five times to no effect, Corporal Winkel took out his pepper foam and held it in his right hand so that Mr. Goins could see it.  (*Id*. at 0:20–0:23.)  While displaying the pepper foam, Corporal Winkel commanded Mr. Goins seven more times to go to his cell.  (*Id*. at 0:23–0:30.)  Corporal Winkel's left hand pointed toward Mr. Goins' cell, which Officer Vazquez held open.  (Id. at 0:29–0:31.)

During this time, Mr. Goins was agitated and responded with constant verbal expression, much of which was intelligible on the bodycam footage.  (*Id*. at 0:23–0:34.)  Later, he acknowledged that, in his uncontrolled anger, he told Corporal Winkel several times to spray him.  (ECF No. 46-1, PageID #451–52.)  The audio does capture Mr. Goins repeatedly saying, "spray me" as he disobeyed Corporal Winkel's commands.  (Winkel Bodycam at 0:23–0:35.)

At this point, Mr. Goins stood in front of his open cell, facing away from it and toward Corporal Winkel.  (*Id.*)  Corporal Winkel briefly touched his right hand to Mr. Goins' upper left arm and guided him in the direction of the cell.  (*Id.* at 0:30–0:32.)  Next, Officer Vazquez put his hand on Mr. Goins' upper right arm in a similar guiding motion.  (*Id.* at 0:33–0:35.)  Mr. Goins did not respond to the touch but continued to speak over Corporal Winkel, "You spray me, I will [unintelligible]." (*Id.* at 0:33-0:35.)  Corporal Winkel later testified that Mr. Goins threatened to beat Corporal Winkel if he deployed the pepper foam.  (ECF No. 45-1, PageID #257.)

At this point, Corporal Winkel lifted his left hand and pressed it against Mr. Goins' chest while directing him to "Step back!"  (Winkel Bodycam at 0:33-0:35.) In the body camera footage, Mr. Goins can be seen lifting his cuffed hands and using them to fling Corporal Winkel's left hand away while admonishing Corporal Winkel, "Don't push me, bro!"  (*Id.*)  Corporal Winkel then repeated the command, "Step back!" several times to no effect.  (*Id.* at 0:35–0:37.)

Although Mr. Goins would not be pushed toward his cell, he allowed Corporal Winkel to escort him to the wall next to it.  (*Id.* at 0:36–0:37.)  Then, Corporal Winkel directed Mr. Goins to turn around and face the wall.  (*Id.* at 0:38–41.)  But Mr. Goins would not turn around, and the body camera did not capture much of his verbal or physical response.  (Id. at 0:40–0:42.)  Surveillance footage suggests that Mr. Goins raised his arms up and down while pulling away and resisting Corporal Winkel's efforts forcibly to turn him.  (Surveillance Video at 17:42–17:44.)

4

The parties agree that Corporal Winkel then sprayed Mr. Goins in the face with his pepper foam. (ECF No. 37, ¶ 15, PageID #175; ECF No. 46-1, PageID #452; ECF No. 56, ¶33, PageID #932-33.) Also, they agree that Mr. Goins responded by grabbing Corporal Winkel's face with his cuffed hands. (ECF No. 46, PageID #453 & 514-15; ECF No. 56, ¶ 36, PageID #933.) As a result, Corporal Winkel and Mr. Goins ended up grappling with each other as three additional officers arrived and raced to intervene. (Surveillance Video at 17:44–17:48.) The two men fell to the floor together as Mr. Goins maintained his hold on Corporal Winkel's face despite officers' efforts to separate them. (*Id.* at 17:48–18:28; ECF No. 46-1, PageID #453–54.)

### B. Aftermath

Once they were separated, Corporal Winkel left the room and was taken to the hospital for possible facial injuries; as he later explained, "[he] thought [Mr. Goins] pulled [his] eyeball out." (ECF No. 45, PageID #276.) He had no further involvement with Mr. Goins that day. (*Id.*)

The remaining corrections officers on the scene placed Mr. Goins in a restraint chair and wheeled him out of the cell area for medical treatment. (Surveillance Video at 18:46–20:42; ECF No. 46-1, PageID #455.) Mr. Goins' face and eyes were washed to remove the pepper foam residue, and he was medically cleared following an examination. (*Id.*) Later, Mr. Goins attributed lingering elbow soreness to hitting the concrete as Corporal Winkel took him to the floor. (ECF No. 46-1, PageID #456–57 & 483–84.) Also, he claims his preexisting post-traumatic stress disorder, anxiety, and depression were exacerbated by his experience being pepper sprayed. (ECF No. 46-1, Page ID #475.)

5

Officials at the jail investigated this incident and reviewed reports that Corporal Winkel and the other officers involved submitted.  (ECF No. 53; ECF No. 46-2.)  Ultimately, Corporal Winkel was not disciplined or given corrective coaching, but Mr. Goins received thirty days in disciplinary isolation.  (ECF No. 45-1, PageID #286; ECF No. 46-2, PageID #544-46.)

## C.  Policies and Procedures

In its written policy, the Cuyahoga County jail permits corrections officers to use chemical agents in exigent circumstances or when reasonably necessary "to prevent or cease physical assault or injury of an individual" or "[i]n circumstances when lesser levels of force have been ineffective during the event."  (ECF No. 45-5, PageID #371.)  "At no time shall chemical agents be applied to a fully restrained inmate unless there is a current imminent threat of serious harm."  (*Id.*)

Months before he pepper-sprayed Mr. Goins, Corporal Winkel responded to an incident with a noncompliant inmate who refused orders to stand and submit to handcuffs.  (ECF No. 45-1, PageID #239–42.)  At that time, Corporal Winkel used "empty hand controls" to manage the inmate's resistance.  (*Id.*, PageID #241.)  Afterward, Corporal Winkel's supervisors provided corrective coaching to encourage him to use pepper foam or to call for assistance to reduce risk of injury to himself and to the inmate.  (*Id.*, PageID #239–42.)

Corporal Winkel testified regarding the training he received on proper use of force in the correctional context.  (ECF No. 45-1, PageID #232–37.)  He was trained to use force where reasonable—not as punishment or on an inmate who is fully restrained, either in a restraint chair or with his hands cuffed behind his back.  (*Id.*,

6

PageID #232.) According to these rules, inmates who are handcuffed in front are not considered fully restrained. (*Id.*, PageID 233–34.) Corporal Winkel explained that not only do such inmates maintain movement of their arms, but they can pose a distinct threat if they use their handcuffs as a weapon. (*Id.*)

Corporal Winkel explained that he was trained to use escalating levels of force before deploying his pepper foam. (*Id.*, PageID #235–36.) When engaging with a resistant inmate, first he used verbal communication in an attempt to diffuse the situation. (*Id.*) Second, he used non-violent physical gestures such as escorting an inmate by hand or attempting to turn him around. (*Id.*, PageID #236–37.) Only after these lesser uses of force did he consider deploying pepper foam. (*Id.*, PageID #236.) He does not use pepper foam on inmates who are only passively resistaned. (*Id.*, PageID #237.) From his prior experience with corrective coaching, Corporal Winkel understood that he was permitted to use pepper spray on an inmate who was only verbally noncompliant. (Id., PageID #247.)

As part of his duties, Corporal Winkel attends 80 hours of officer training each year, including on topics such as pepper spray use and use of force. (ECF No. 45-1, PageID #222–23 & #225.)

## STATEMENT OF THE CASE

On April 11, 2024, Plaintiff Justin Goins filed suit without a lawyer against Corporal William Winkel, alleging civil rights violations under the Eighth and Fourteenth Amendments. *Goins v. Winkel*, No. 1:24-cv-00653 (N.D. Ohio) ("*Goins I*"). On July 10, 2025, Plaintiff filed a second action against Corporal Winkel and

7

Defendant Cuyahoga County Correctional Center, which included additional allegations. *Goins v. Winkel*, No. 1:25-cv-01448 (N.D. Ohio) ("*Goins II*"). The Court appointed the same counsel for Mr. Goins in both cases (ECF No. 32) and consolidated the two cases (ECF No. 36.)  Since the consolidation, the activity in both cases has occurred on the docket of the first.  At the Court's direction (*id.*), Plaintiff filed an amended complaint (ECF No. 37).

On August 8, 2025, Plaintiff filed his first amended complaint against Defendants Corporal William Winkel, in his individual capacity, and the Cuyahoga County Sheriff, in his official capacity.  (*Id.*)  Pursuant to 42 U.S.C. § 1983, the amended complaint asserts two claims against Corporal Winkel:  excessive force in violation of the Fourteenth Amendment (Count I) and deliberate indifference to serious medical needs in violation of the Fourteenth Amendment (Count II).  (*Id.*) Additionally, Plaintiff brings his claim against the Sheriff under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), for maintaining a custom, policy, or practice that violated his constitutional rights (Count III).  (*Id.*)

On January 30, 2026, Defendants moved for summary judgment on all counts. (ECF No. 58.)  They argue that Corporal Winkel's use of force was objectively reasonable and that Defendant Winkel had no knowledge of Plaintiff's medical needs. (ECF No. 58-1, PageID #954–59.)  Additionally, Defendants maintain that Corporal Winkel has qualified immunity because he did not violate a clearly established constitutional right of Mr. Goins.  (Id., PageID #959–62.)  In response to Plaintiff's claim against the Sheriff, Defendants argue that the Sheriff's Office appropriately

investigated the incident, adequately trained its officers, and exhibited no pattern of constitutional violations. (*Id.*, PageID #962–68.) Plaintiff opposes summary judgment, but does not oppose summary judgment on his claim for deliberate indifference to Mr. Goins' serious medical needs (Count II). (ECF No. 59, PageID #974.)

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008). After discovery, summary judgment is appropriate if the nonmoving party fails to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

At this stage, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Celotex Corp.*, 477 U.S. at 322). Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial." Id. (citing *Anderson*, 477 U.S. at 250). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

If a genuine dispute exists, meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250). However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id*. The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48). "Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned up) (citations omitted). "Conclusory statements unadorned with

10

supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

To determine whether a genuine dispute about material facts exists, it is not the court's duty to search the record; instead, the parties must bring those facts to the court's attention. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251.I.

## I.    Excessive Force

Section 1983 provides a federal cause of action to a person whose rights "secured by the Constitution" are violated by an official acting "under color of [State law]." 42 U.S.C. § 1983. In this way, Section 1983 "creates a species of tort liability" where State actors violate federal constitutional rights. *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (citation omitted). "The first inquiry in any § 1983 suit is to isolate the precise constitutional violation" alleged. *Graham v. Connor*, 490 U.S. 386, 394 (1989) (internal quotation marks and citation omitted). "After pinpointing" the constitutional right at issue, "courts still must determine the elements of, and rules associated with, an action seeking damages for its violation." *Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017). Under Section 1983, "the general 'common law of torts'" bridges the gap between a constitutional right and the elements of a cause of action. *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021) (citation omitted).

11

Defendants argue that they are entitled to summary judgment on Count I because Corporal Winkel's use of force was not objectively unreasonable in the context of Mr. Goins' conduct.  (ECF No. 58-1, PageID #954–58.)  Plaintiff counters that his conduct amounted to passive resistance and that Corporal Winkel's use of pepper foam was, therefore, excessive.  (ECF No. 59, PageID #981-87.)

The Fourteenth Amendment protects the right of a person in pretrial detention to be free from excessive force.  *Hopper v. Plummer*, 887 F.3d 744, 751 (6th Cir. 2018) (citing *Phelps v. Coy*, 286 F.3d 295, 299–300 (6th Cir. 2002)).  "[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."  *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989).  To prevail on a claim of excessive force, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015).  This inquiry does not turn on the subjective intent of the officer involved; instead, the standard is objective, examining what an officer would reasonably have known at the time.  *Id.* at 397–98.  In assessing objective reasonableness, the Supreme Court identified the following non-exhaustive list of considerations:  (1) "the relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting."  *Id.* at 397.

These considerations protect an officer who acts in good faith. *Id.* at 399. Also, they account for the government's legitimate interests, including its need to effectively manage a jail facility and to preserve internal order, discipline, and security. *Id.* at 397. We "defer[ ] to policies and practices" that, "in the judgment of jail officials," are necessary to "preserve internal order and discipline and to maintain institutional security." *Id.* at 397. For example, a corrections officer's "need to ensure order and security in the jail authorized him to use a takedown maneuver on an uncooperative inmate who refused to be handcuffed." *Whyde v. Sigsworth*, No. 22-3581, 2024 WL 4719649, at *8 (6th Cir. Nov. 8, 2024).

As a general matter, "[i]nside a jail, correctional officers may use chemical agents against recalcitrant prisoners for disobeying orders." *Young v. Kent Cnty. Sheriff's Dep't*, No. 21-1222, 2022 WL 94990, at *4 (6th Cir. Jan. 10, 2022) (citing *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992)). Whether use of such an agent constitutes excessive use of force depends on the totality of the circumstances and the considerations outlined in *Kingsley*. Where a corrections officer deployed pepper spray on an inmate who argued and refused commands to step out of a doorway, that action was not an excessive use of force. *Young v. Jourden*, No. 1:19-cv-854, 2021 WL 716896 (W.D. Mich. Feb. 24, 2021), *aff'd sub nom. Young v. Kent Cnty. Sheriff's Dep't*, No. 21-1222, 2022 WL 94990 (6th Cir. Jan. 10, 2022). However, once this inmate was incapacitated by the pepper spray, tasing him was excessive because he no longer posed a threat or actively resisted. *Id.*

13

Here, the parties focus on whether Mr. Goins engaged in "active resistance" within *Kingsley*'s framework.  (ECF No. 59, PageID #982–87; ECF No. 60.) "Noncompliance alone does not indicate active resistance."  *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013).  Instead, active resistance requires "some outward manifestation—either verbal or physical—on the part of the suspect" suggesting "volitional and conscious defiance."  *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013).  To determine whether active resistance is present, a suspect's noncompliance with official orders must be considered in its context, such as where a suspect is "hostile, belligerent, and had thrashed around in an agitated state."  *Id*. at 534.  In cases where arrestees refused to move their hands for handcuffing while also making defiant statements or "kicking and screaming so as to avoid arrest," such combinations of behaviors constituted active resistance.  *Id*. at 534 (referencing *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 507 (6th Cir. 2012)).

Initially, Corporal Winkel observed Mr. Goins shouting and creating a disturbance while appearing to have a conflict with Officers Vazquez and Baker. Through his own interactions, Corporal Winkel found that Mr. Goins not only refused to obey numerous commands to return to his cell but responded to his orders with verbal defiance (for example, "I ain't doing shit, n****").  When Corporal Winkel displayed his can of pepper foam, Mr. Goins repeatedly challenged him saying, "Spray me."  When Corporal Winkel pushed Mr. Goins in the direction of his cell, Mr. Goins used his cuffed hands to push away Corporal Winkel's hand.

14

These facts and circumstances objectively show both verbal and physical manifestations of defiance.  In the face of Mr. Goins' defiance, Corporal Winkel escalated his use of force gradually, only deploying his pepper foam when they stood in close proximity and Mr. Goins refused to turn toward the wall.  Additionally, Corporal Winkel was aware that, because Mr. Goins was cuffed in front, he maintained a significant range of motion with his arms and the ability to use his handcuffs as a weapon.  Indeed, Mr. Goins used his cuffed hands to repel Corporal Winkel, highlighting the fact that he was not fully restrained and was inclined to resist physically as well as verbally.

The fact that this incident took place inside a jail strengthens this conclusion. Mr. Goins created a loud disruption within the jail and persisted in noncompliance despite the presence of three corrections officers and Corporal Winkel's gradual escalating use of force.  In his setting, and on these facts, deference is due to the government's reasonable interest in maintaining order, discipline, and security within its jails. *Kingsley*, 576 U.S. at 397.

For these reasons, Corporal Winkel's use of force was not excessive, as a matter of law.  No rational jury could conclude otherwise.  Therefore, Defendants are entitled to summary judgment on this claim.

## II.    *Monell* **Claim Against the Sheriff**

To prevail on a *Monell* claim under Section 1983, a plaintiff must demonstrate a constitutional violation and a policy, practice, or custom that causes the alleged constitutional violation.  *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690-91 (1978); *Johnson v. Hardin Cnty.*, 908 F.2d 1280, 1285 (6th Cir. 1990).

15

Under Section 1983, a municipality or supervising official cannot be held vicariously liable on a theory of *respondeat superior* for a violation of an individual's constitutional rights that its officers, employees, or agents commit.  *Thomas v. City of Chattanooga*, 398 F.3d 426, 432–33 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694); *Okoro v. Scibana*, 63 F. App'x. 182, 184 (6th Cir. 2003).  Instead, a municipality or supervising official has liability for a policy or practice that caused a constitutional injury "through its deliberate conduct."  *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404–05 (1997).  Therefore, without an underlying constitutional violation, "[t]here can be no liability under *Monell*."  *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Scott v. Clay  Cnty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000)); *Heyerman v. City of* Calhoun, 680 F.3d 642, 648 (6th Cir. 2012).  For this reason, Defendants are entitled to summary judgment on Count III as well.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment.  (ECF No. 58.)

**SO ORDERED.**

Dated:  August 6, 2026

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio

16